**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3977-17T3

GERARDINA GOMEZ and
JUAN GOMEZ, her husband,

      Plaintiffs-Respondents,

v.

ALLISON M. FRITSCHE and
JACLYNN FRISCHE,

      Defendants-Appellants.

_____

Submitted February 27, 2019 – Decided September 12, 2019

Before Judges Nugent and Mawla.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-3014-16.

Law Offices of Viscomi & Lyons, attorneys for appellants (Brittany Sadé Hale, on the brief).

Shamy & Shamy, LLC, attorneys for respondents (T.K. Shamy, on the brief).

PER CURIAM

This is an automobile negligence action. A jury found defendant, Allison M. Fritsche, 100% negligent for causing an intersectional collision and awarded plaintiff, Gerardina Gomez, $115,000.[1] Defendant appeals the denial of her motion for a new trial. She argues the cumulative prejudice from several errors—the trial court barring evidence plaintiff had previously sustained permanent injuries, the investigating police officer opining on fault, the trial court prohibiting defense counsel from objecting during plaintiff's summation, and plaintiff's improper closing remarks to the jury—deprived her of a fair trial. We agree. We vacate the order entered on the verdict, and remand for a new trial.

## I.

The accident occurred on December 8, 2014, at approximately 4:42 p.m., in Franklin Township. Plaintiff was driving a Toyota Highlander on Easton Avenue toward New Brunswick. Defendant, who was driving a Kia Sportage, turned right from Castleton Avenue onto Easton Avenue toward New

---

[1] The trial court dismissed the complaint against Jaclynn Fritsche on summary judgment. The jury found Juan Gomez had not proven his claim for loss of services, society, and consortium from his wife, Gerardina Gomez. For these reasons, we refer to Gerardina Gomez as plaintiff and to Allison M. Fritsche as defendant.

A-3977-17T3

Brunswick. The vehicles collided. Neither weather nor lighting conditions contributed to the accident. The parties disputed liability.

Easton Avenue had two traveling lanes in each direction. Plaintiff testified at trial that after leaving work in Somerset, she drove on Easton Avenue toward her New Brunswick residence for approximately twenty minutes before the accident, all the time staying in the right-hand, curb lane. She explained: "Yes, I was going on the right lane, straight. And this lady, I didn't see, I didn't see her because it was very fast and she hit me." Plaintiff added: "So then I right away took control of the car and that's why I swerved immediately to the right because I was trying to avoid hitting the cars on the left side. And that's why I got up on the curb."

In contrast, defendant testified that after turning right from Castleton Avenue onto the curb lane of Easton Avenue, the Toyota driven by plaintiff veered quickly from the left lane, closest to the centerline, into the right lane, catching defendant's front bumper, which was ripped off during the accident. She explained to the jury:

> So while I was at the stop at Castleton going onto
> Easton Avenue, there were a few cars that were going
> by so I had let them go. And then from that stop, I had
> made with my signal on, had made a right onto Easton
> Avenue, with a clearance in the right lane, the left lane
> still had a few cars in it, but the right lane was clear for

3

me to pull through. I made a right from the stop onto Easton Avenue and as I was accelerating forward onto Easton, I had a car come across me, and impacted the front left of my car and ended up in front of me, up near the curb.

Plaintiff called the investigating police officer as a witness. Over defendant's objection, the officer testified not only about what plaintiff and defendant said at the scene, as written in his report, but also about the conclusions he reached. He quoted plaintiff as saying "that as she traveled south on Easton Avenue, [the vehicle driven by defendant] suddenly came out of Castleton Ave. and crashed into her car. [Plaintiff] indicated [defendant] appeared to just come out into the roadway without stopping." The officer quoted defendant as saying "that she thought it was clear to enter the roadway and didn't see [plaintiff's vehicle]."

The court permitted plaintiff to elicit this opinion from the officer:

Q. Now, as a result of your accident investigation and the preparation of your report, did you reach a conclusion relative to your investigation?

A. Yes.

Q. Okay. Can you tell us what that conclusion is?

A. I'll read my conclusion. The investigation revealed that [defendant] failed to yield to [plaintiff's vehicle] and was inattentive by not ensuring that the roadway was clear prior to entering.

4

On cross-examination, when confronted with the statement attributed to her in the police report, defendant acknowledged she did not see plaintiff's vehicle before impact but reiterated plaintiff's vehicle came from her left.

The parties also disputed the nature and extent of plaintiff's injuries. Plaintiff had filed a motion in limine to preclude defendant from mentioning in her opening statement or during her cross-examination of plaintiff anything about two previous accidents plaintiff had been involved in, one that occurred in 1994, and the other in 2000. Plaintiff had injured her neck and back in the 1994 accident. A doctor had written in a report that plaintiff had suffered permanent injuries to her neck and back and would have ongoing pain and difficulty with both.

The court granted plaintiff's motion. The court determined that any probative impeachment value of the evidence—plaintiff had previously sustained permanent injuries to the same body parts for which she was presently seeking compensation for permanent injuries—was substantially outweighed by the risk of undue prejudice, "its remoteness in time, its confusion of the issues, and it would mislead the jury." In response to defense counsel's specific question, the court ruled that even if plaintiff testified she never had any

A-3977-17T3

problems with her neck, back, or shoulder, defendant could not impeach her with evidence of the allegedly permanent injuries she previously sustained.

Plaintiff and her treating physician testified about plaintiff's injuries and her course of treatment. Plaintiff testified that in the days, months, and years leading up to the accident, she had no pain in her neck, shoulder, or back. Plaintiff was taken by ambulance from the accident scene to a hospital emergency room where a CT scan of her head was unremarkable. She was treated and released. Four days later, she came under the care of Dr. David Weiss, who is board certified in orthopedics and in performing independent medical examinations.

Dr. Weiss had x-rays taken of plaintiff's cervical spine, lumbar spine, and left shoulder. They were normal. The doctor treated plaintiff for ongoing problems involving her neck or cervical spine, her low back or lumbar spine, and her left shoulder. The doctor diagnosed plaintiff with post-traumatic headaches, cervical and lumbar sprain and strain patterns, and impingement syndrome of the left rotator cuff.

Plaintiff's treatment initially consisted of medication and physical therapy. Plaintiff had physical therapy through August of the following year, 2015, but during the interim, when her symptoms did not resolve, Dr. Weiss had

A-3977-17T3

her undergo additional diagnostic testing. December 2014 magnetic resonance imaging (MRI) studies of plaintiff's left shoulder were negative. May 2015 MRIs of plaintiff's cervical and lumbar spine were the subject of disputed expert testimony. Dr. Weiss testified the cervical MRIs showed herniated discs at C5-6 and C7-T1, and the lumbar MRI showed a herniated disc at L5-S1.

In view of the MRI findings, and because plaintiff's symptoms did not resolve, Dr. Weiss referred her to a pain management specialist. The specialist gave her an injection—an epidural block—in her lower cervical spine. During Dr. Weiss's testimony, he identified a spinal needle similar to the one used for the injection.

Plaintiff testified she got some relief —for a few weeks—from her neck pain from the epidural injection, but the pain eventually returned to its pre-injection level. When she last saw Dr. Weiss in February 2016, she was still experiencing pain in her neck, left shoulder, and her back. She continued to experience these symptoms through the time of her trial. Due to her ongoing problems, she had stopped lifting heavy objects at work. In addition, she curtailed her household and social activities. She could no longer mop or carry groceries. She could no longer move furniture and could no longer cook as long as she had cooked before the accident. Plaintiff had enjoyed dancing, but with

A-3977-17T3

her pain, if she danced once or twice at family outings, she had to sit down and could dance no longer.

Plaintiff also had difficulty sleeping. She said she had nightmares about the accident. She also said that when she slept, her left arm would go numb, her left shoulder would hurt, and her neck and the lower part of her back would also hurt. Sometimes she would get headaches. Her intimacy with her husband was not the same.

Dr. Weiss testified that his final diagnosis was strain and sprain patterns to plaintiff's neck and lower back; herniated discs in the neck at C5-6 and C7-T1, and a herniated disc at L5-S1; radiculitis—the complaint of radiating pain going down one's arm or leg—in both the cervical and lumbar spine; and a labral tear to the left shoulder, as well as subacromial bursitis to the left shoulder. In the doctor's opinion, these injuries were permanent. Although Dr. Weiss believed plaintiff would continue to experience episodes of neck pain, lower back pain, and left shoulder pain, and would have some restrictions of activities of daily living and working, he did not believe she was a surgical candidate.

Defendant's expert, Dr. Kevin Egan, an orthopedic surgeon, had opinions quite different from those held by Dr. Weiss. Dr. Egan examined plaintiff and reviewed plaintiff's medical records, including the MRI studies. He did not see

evidence of herniated discs on the cervical MRI studies. He did see evidence of bulging discs. He saw no evidence of a cervical sprain or strain when he examined plaintiff on March 7, 2017. According to Dr. Egan, the lumbar MRI studies showed "some minimal, age-related degenerative processes at multiple levels, particularly at L4/5." These changes were not caused by trauma.

Dr. Egan told the jury that the treatment plaintiff received was "a normal treatment program for a temporary soft tissue injury." The injuries were temporary, meaning they were treated for a while, and they resolved. He explained that at the conclusion of plaintiff's treatment, she became asymptomatic and needed no additional treatment. She had excellent mobility in her neck and back when he examined her, with no evidence of pain or discomfort "on any of the examination components[.]" He saw no musculoskeletal dysfunction. In short, there was no evidence during his examination or in any of the medical records he reviewed to support a claim of permanent injury.

During plaintiff's closing argument, her attorney made several statements defense counsel thought were objectionable. The first time she objected, however, the court instructed her not to object during her adversary's closing

argument. The record reveals the following, beginning with the comments that prompted the objection.

> [Plaintiff's Counsel]: Now, we talk about harm, we talk about responsibility for the harm. I'm just going to mention briefly, I, the defendant came here, she testified about her story and then she left. She's not here to see this through, ladies and gentlemen, not like the plaintiff, Gerardina Gomez.
>
> [Defense Counsel]: Objection, Your Honor.
>
> [Plaintiff's Counsel]: She's not.
>
> [Defense Counsel]: Sidebar, please.
>
> [Plaintiff's Counsel]: With me?

Counsel proceeded to sidebar, where the following exchange occurred:

> [Defense Counsel]: Your Honor, I'm going to object during plaintiff counsel's closing however to assume that she is not here for any reason, you know, or to have them assume that she's, hasn't, she won't be because she doesn't want to –
>
> THE COURT: First of all let me, let me lay the ground rules down. I should have mentioned this earlier, there's no objections in closing argument. Now that you've done it, I suggest it's, it's closing argument. He's entitled to argue and if he wants to put that inference out there and draw an inference it's fair game. I don't know why she's here, she's not here, but, you know, I don't understand the objection and it's overruled.

A-3977-17T3

Defense counsel heeded the court's admonition. In doing so, she did not immediately object when plaintiff's counsel suggested through a rhetorical question that the jurors place themselves in plaintiff's situation:

> And one of the things that Dr. Weiss did for her was to send her for her neck pain to a pain management doctor. And Dr. Weiss testified for you about that procedure.
>
> Do you think, [l]adies and gentlemen, people go to doctors to have needles like this put in their spine if they're not experiencing pain? Would you submit to having a needle of this nature put in your spine if you weren't having neck pain? I submit to you, ladies and gentlemen, you wouldn't do that. You do that because you're having pain, you want relief, that's the whole point. You don't do this just because you want to have somebody stick a needle in your back when you could potentially have a problem as a result of the procedure. Dr. Egan said, oh, this is an office procedure. I think the plaintiff and Dr. Weiss testified, it's a surgical procedure, this is serious stuff.

Following the verdict, defendant filed a motion for a new trial, which the trial court denied. This appeal followed.

## II.

## A.

On appeal, defendant argues the trial court committed the following errors: prohibited her from impeaching plaintiff on her prior accidents and treatment; permitted the investigating officer to give an opinion on fault;

11

prohibited her from objecting to plaintiff's closing argument; and permitted plaintiff to make improper remarks during her closing argument. Defendant contends that separately or cumulatively, the errors require reversal. She contends for these reasons, the trial court erroneously denied her motion for a new trial.

Plaintiff responds that the court properly exercised its discretion when it precluded plaintiff from examining either of the medical experts about her previous accidents and injuries. She emphasizes that the investigating police officer never used the word "fault" when he explained to the jury the conclusions he drew from his investigation. Rather, he did little more than summarize the statement made to him by defendant. Plaintiff insists her closing statement to the jury does not warrant a new trial on either liability or damages.

### III.

We begin by reviewing two of the trial court's rulings: the first prohibiting defendant from presenting evidence of plaintiff's prior permanent injuries, the second permitting plaintiff to present the opinion testimony of the police officer. As a general matter, trial courts have considerable discretion in determining whether proffered evidence is relevant, and if so, whether it should be excluded under N.J.R.E. 403 because its probative value is substantially outweighed by

12

other considerations such as the risk of undue prejudice, confusion of issues, or misleading the jury. Wymbs v. Twp. of Wayne, 163 N.J. 523, 537 (2000). We thus review such decisions for abuse of discretion. Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-84 (2010). Abuse of discretion occurs when a trial court's ruling results in "manifest error or injustice," Hisenaj v. Kuehner, 194 N.J. 6, 20 (2008) (quoting State v. Torres, 183 N.J. 554, 572 (2005)), or when "there has been a clear error of judgment," State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)).

## A.

We first consider under our standard of review the trial court's in limine ruling that precluded defendant from using the contents of an old medical report to impeach plaintiff. Defendant represented to the court that during discovery she received a doctor's narrative report in which the doctor opined plaintiff had "sustained a permanent injury and would have ongoing pain and difficulty with both her neck and back" as a result of a previous accident. Defendant noted plaintiff had testified at her deposition she was involved in only one previous accident and the only injuries she sustained were to her right arm. Defendant insisted she had the right not only to impeach plaintiff with extrinsic evidence, but also to examine Dr. Weiss about plaintiff's previous accident because "Dr.

13

Weiss note[d] [plaintiff] was involved in a prior motor vehicle accident in April, 1999."

The introduction of such evidence presents many issues. As a threshold matter, the report concerning injuries plaintiff sustained in a prior accident was hearsay. Hearsay is inadmissible except as provided in our Rules of Evidence. N.J.R.E. 802.

There is no blanket cross-examination exception to N.J.R.E. 802. To the contrary, "[h]earsay . . . not admissible in chief, may not be elicited by cross-examination." State v. De Paola, 5 N.J. 1, 13 (1950). For that reason, it would have been improper for defendant to place before the jury—through cross-examination of plaintiff—an extrinsic, decades-old expert's opinion. Experts' reports are statements, "but, unlike answers to interrogatories, are not statements of a party and therefore cannot be treated as an admission simply because a party furnished them in discovery." Corcoran v. Sears Roebuck & Co., 312 N.J. Super. 117, 126 (App. Div. 1998) (citing Skibinski v. Smith, 206 N.J. Super. 349, 353 (App. Div.1985)). Additionally, it is improper to cross-examine a plaintiff, who is not a medical expert, about the opinion of a medical expert. We note that we have not been asked to review the use for impeachment purposes

of statements in the old report attributable to plaintiff.  That was not an issue argued to, or addressed by, the trial court.[2]

Defendant also argued that Dr. Weiss "note[d] that [plaintiff] was involved in a prior motor vehicle accident in April, 1999."  Defendant asserted that "because that's in his report we have every right to ask him about that."  The evident deficiency in such a conclusory assertion is its invocation of no authority other than a self-proclaimed right.

There is a difference between experts reviewing material on one hand, and relying on material to form opinions on the other.  Excluding examination at trial under N.J.R.E. 403 would more likely occur in the former instance.  That is so because N.J.R.E. 703 provides that the facts or data upon which an expert bases an opinion "need not be admissible in evidence" if such facts are "of a

---

[2]  Nor have we been asked to address whether the trial court erred in ruling defendant could not impeach plaintiff with evidence of the prior accident even if plaintiff testified she had never previously been injured.  Such a ruling would appear to impede a search for the truth.  We fail to discern, for example, why if, hypothetically, plaintiff denied prior accidents or injuries, defendant could not question her about events such as the time and location of the previous accident and whether she received certain treatment, without placing the content of a medical report before the jury.  In any event, the record before us is not entirely clear on this point.  If the trial court intended to bar defendant from commenting on these issues in her opening statement, so that—upon defendant's application out of the jury's presence—the court could rule on the specific issue in the context in which it unfolded at trial, then there was nothing inappropriate about the court's ruling.

type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject[.]"  If an expert has relied upon such facts or data, the expert may be cross-examined about them.  N.J.R.E. 703 may not, however, be used as "a vehicle for the wholesale [introduction] of otherwise inadmissible evidence."  State v. Vandeweaghe, 351 N.J. Super. 467, 481 (App. Div. 2002) (alteration in original) (quoting State v. Farthing, 331 N.J. Super. 58, 79 (App. Div. 2000)).  That would occur if an expert were permitted to be examined or cross-examined about every document the expert reviewed, even if the expert did not rely upon facts or data in the document to form an opinion.  This presents an issue that falls within a trial court's discretion.

Here, exposing the old report's contents to the jury presented other potential problems, particularly because we do not know the circumstances under which the doctor wrote it.  If plaintiff requested the report to prove she sustained permanent injuries for which she sought compensation in a lawsuit, the report was relevant.  After all, how many times should a plaintiff be permitted to recover damages for the same permanent injuries to the same body parts?  Yet, if there had been a lawsuit, and if plaintiff had been examined by a defense doctor who concluded she had not sustained permanent injuries, could plaintiff have utilized the defense doctor's report to show there was a difference

of opinion about whether she sustained a permanent injury, and thus bolstered her testimony in the current case?

Defendant did not intend to call as a witness the doctor who wrote the decades-old report. She did not explain the circumstances under which the old report had been written. She apparently intended to impeach plaintiff by demonstrating the medical opinion contained in the old report was inconsistent with plaintiff's deposition testimony, and by questioning plaintiff's treating physician about the old report, even though the treating physician did not rely upon the facts and data in the old report to form his opinion in the present case.

Considering all the foregoing circumstances, the trial court acted well within its broad discretion when it prohibited defendant from utilizing the old report at trial.

B.

We reach a different conclusion concerning the police officer's opinion. It should not have been admitted, and the trial court misapplied both the law and its discretion in doing so.

In general, "a police report is admissible as a record of a regularly conducted activity, commonly known as a business record, N.J.R.E. 803(c)(6), and as a public record, N.J.R.E. 803(c)(8)." Manata v. Pereira, 436 N.J. Super.

330, 345 (App. Div. 2014). If properly authenticated, police reports may be admissible to show, for example, a person spoke to an officer, ibid., or that a report of a crime was made and the time of the report, State v. Lungsford, 167 N.J. Super. 296, 310 (App. Div. 1979).

If a proponent seeks to admit the report—or the officer's testimony to its content—to prove the truth of a person's statement contained in the report, the person's statement is embedded hearsay and requires a separate hearsay exception. N.J.R.E. 805; Manata, 436 N.J. Super. at 345; Konop v. Rosen, 425 N.J. Super. 391, 402 (App. Div. 2012). Thus, a party involved in an automobile accident cannot elicit at trial through the testimony of the investigating police officer the statement he or she gave to the officer at the time of the accident, absent a separate hearsay exception. Neno v. Clinton, 167 N.J. 573, 585 (2001); Rice v. Miller, 455 N.J. Super. 90, 107 (App. Div. 2018) (noting "[i]n Neno, 167 N.J. at 585, the Supreme Court clearly prohibited the use of testimony by a police officer as such a conduit of hearsay by other declarants").

Our appellate courts have also proscribed the admission of police testimony—lay or expert—on the issue of who was at fault in an automobile accident. As a threshold matter, to present a police officer as an expert, the officer must qualify as such under N.J.R.E. 702. Equally important, the

proponent of a police officer's expert testimony must provide proper notice of the intent to present the officer as an expert:

> The pretrial rules of our civil courts have specific requirements for parties to designate expert witnesses during the course of discovery. See generally R. 4:17–4(e) (requiring litigants to furnish opposing parties with the names and reports of experts and treating physicians who are involved in the matter); R. 4:17–7 (imposing an obligation for parties to amend their interrogatory answers "not later than [twenty] days prior to the end of the discovery period"). The obvious purpose of these disclosure requirements for anticipated experts is to promote fair advocacy and to discourage gamesmanship or unfair surprise at trial.
>
> [Rice, 455 N.J. Super. at 105.]

A police officer may be permitted to express a lay opinion. Lay opinion testimony is admissible "if it (a) is rationally based on the perception of the witness and (b) will assist in understanding the witness' testimony or in determining a fact in issue." N.J.R.E. 701. "The central purpose of N.J.R.E. 701 is to ensure that lay opinion is based on a sufficient foundation, and not inadmissible hearsay." Rice, 455 N.J. Super. at 104 (citing Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 701 (2018)). Thus, "lay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." State v. McLean, 205 N.J. 438, 460 (2011). For that reason, we have held that a law enforcement officer

19

went "clearly beyond the scope of lay opinion admissible under N.J.R.E. 701" when he expressed an opinion concerning fault for an auto-pedestrian accident though he "had no personal observation or recollection of the accident." Gonzales v. Hugelmeyer, 441 N.J. Super. 451, 460 (App. Div. 2015).

It is thus settled that "a police officer cannot provide an opinion at trial when that opinion is based primarily on the statements of eyewitnesses." Ibid. (quoting Neno, 167 N.J. at 585). Any other conclusion . . . would allow an officer to subvert the hearsay prohibition[.] Id. at 460-61 (quoting Neno, 167 N.J. at 585); accord, Rice, 455 N.J. Super. at 106.

That is what happened here. Plaintiff argues that the officer never used the word "fault." We reject this argument. Although couched in terms of his "conclusions," the questions and answers leading up to the officer's opinion, the question that elicited the opinion, and the officer's response, all made clear that the officer was expressing his opinion that defendant was at fault for causing the accident.

Plaintiff's attorney compounded the error when he not only emphasized the point in summation, but also suggested to the jury that defendant did not want the jurors to hear the officer's testimony:

> But it goes, it goes further. Police Officer Bird
> testified, counsel has a problem with Of[ficer] Bird.

You know, the plaintiff subpoenaed Of[ficer] Bird to come here, to tell you about his accident investigation. The defendant didn't want him here, the defense didn't want him to come and, and tell you, ladies and gentlemen, about how the accident happened according to his investigation. He came, this guy has no interest in this case. He's an officer, a sworn police officer doing his job, he doesn't . . . have any bias one way or another. He conducted an investigation and sure, he's done hundreds of reports, of course he doesn't remember this accident, ladies and gentlemen. If he did, he'd be a pretty special police officer but he doesn't remember and rightfully so. He reviewed his police report as he sat here before you and told you the results of his police investigation. And not only told you that but told you what he was told by the drivers of the vehicle on that particular day.

And you're going to have this report in evidence and you can see it along with his diagram of what he believes happened. He has in here clearly, I do not have my glasses but I – [defendant] stated that she thought it was clear to enter the roadway and didn't see vehicle one.

Defense counsel "ha[d] a problem" with the officer's testimony because the officer expressed an improper lay opinion; not because, as plaintiff's counsel suggested, she did not want the jury to hear competent testimony concerning the material issues in the case. The police report with the officer's opinion as to fault, his diagram of the accident based on hearsay, and all the report's other embedded hearsay was admitted in evidence for the jury's consideration.

21

Defendant should indeed have objected to this evidence, which was improperly admitted for the jury's consideration.

Plaintiff argues the photographic evidence was compelling as to fault. If she is suggesting that in view of other evidence the officer's improper testimony and the improper admission in evidence of the police report were harmless, we disagree. The parties were the only eyewitnesses to the accident. As plaintiff's counsel suggested in summation, the officer was a neutral witness with no stake in the case. For that reason, and for the other reasons plaintiff's counsel emphasized the officer's testimony in summation, we cannot conclude the improper admission of the officer's testimony and report were not clearly capable of producing an unjust result. This is especially so in this case, where the jury's assessment of even ten percent comparative negligence against plaintiff would have reduced damages by more than $10,000.

## IV.

We turn now to defendant's argument concerning plaintiff's summation.

## A.

Defendant first contends the court erred by prohibiting her from objecting during plaintiff's closing remarks to the jury. There is precedent for the proposition that challenging an adversarial attorney's improper closing remarks

following the closing, rather than during it, timely alerts the court to the improprieties and provides the court with an opportunity to cure them. State v. Farrell, 61 N.J. 99, 106 (1972); State v. Bauman, 298 N.J. Super. 176, 207 (App. Div. 1997).

Nonetheless, a party may be precluded from claiming prejudice absent a timely objection to improper remarks made during a closing argument. Farrell, 61 N.J. at 106. "Absence of contemporaneous objection may lead to a fair inference that 'in the context of the trial the error was actually of no moment.'" State v. McGuire, 419 N.J. Super. 88, 149-50 (App. Div. 2011) (quoting State v. Nelson, 173 N.J. 417, 471 (2002)). In McGuire, in response to defendant's claim that the judge discouraged objections during closing arguments, we noted, "[t]o preserve a proper record, a trial judge should not admonish counsel against making appropriate objections." Id. at 150 n.7. Moreover, the promptness of a curative instruction is one gauge of its effectiveness. See State v. Wakefield, 190 N.J. 397, 440 (2007). A prohibition against contemporaneous objections could result in an attorney making an unchecked string of improper and prejudicial remarks during a closing argument.

Although most precedent on the issue appears in the context of criminal cases, the precedential underpinnings apply to civil cases as well. We

understand the concern that some attorneys might be tempted to abuse the process by making meritless or even frivolous objections to disrupt the flow of an adversary's closing remarks. We have confidence that our trial courts can swiftly deal with any such abuses. We thus reiterate that a trial judge should not admonish counsel against making appropriate contemporaneous objections.

B.

We next address defendant's objections to specific remarks plaintiff's counsel made during closing argument. They include the statement that defendant did not return after testifying because unlike plaintiff, defendant did not want to see the case through, and defense counsel's suggestion about why the jurors would or would not have an epidural injection. As previously noted, plaintiff's counsel also disparaged defense counsel by suggesting she had a problem with, and did not want the jury to hear, the police officer's conclusion about the accident.

A common theme runs through our cases concerning closing arguments. It is the same theme that underlies the Rules of Court and the Rules of Evidence: cases are to be decided "upon real merits of the causes and not upon the skill and maneuvering of counsel." Abtrax Pharm., Inc. v. Elkins–Sinn, Inc., 139 N.J. 499, 512 (1995) (quoting Oliverio v. Porter Hayden, Co., 241 N.J. Super. 381,

24

387 (App. Div. 1990)). Thus, "counsel is allowed broad latitude in summation[.]" Bender v. Adelson, 187 N.J. 411, 431 (2006). Yet, though "arguments are expected to be passionate," they may not include unfair and prejudicial appeals to emotion. Jackowitz v. Lang, 408 N.J. Super. 495, 504-05 (App. Div. 2009).

Arguments must be based in truth, and "[c]ounsel may not 'misstate the evidence nor distort the factual picture.'" Condella v. Cumberland Farms, Inc., 298 N.J. Super. 531, 534 (Law Div. 1996) (quoting Matthews v. Nelson, 57 N.J. Super. 515, 521 (App. Div. 1959)). "Although attorneys are given broad latitude in summation, they may not use disparaging language to discredit the opposing party, or witness, or accuse a party's attorney of wanting the jury to evaluate the evidence unfairly, of trying to deceive the jury, or of deliberately distorting the evidence." Rodd v. Raritan Radiologic Assocs., P.A., 373 N.J. Super. 154, 171 (App. Div. 2004) (citations omitted).

It is also improper to invoke the "golden rule," that is, to ask the jury to assess what they would want as compensation as if they had suffered the injuries or to decide the value of the case based upon what the pain and suffering would be worth to them. Botta v. Brunner, 26 N.J. 82, 94 (1958).

Here, plaintiff's counsel disparaged defense counsel by suggesting she did not want the jury to hear evidence—evidence that should not have been admitted. Plaintiff's counsel also disparaged defendant by suggesting she did not want to see the case through. Although plaintiff's counsel did not invoke the "golden rule" by asking the jurors to award what they would want as compensation, he improperly suggested that they should decide plaintiff's credibility by considering, among other things, what their motivation would be for undergoing certain medical treatment in similar circumstances. All of these comments were improper. Arguably, they could have been cured following a contemporaneous objection. Not only had the trial court prohibited that course of action, but the court took no corrective action at all, and overlooked its error when defendant filed her post-verdict motion.

V.

"[W]e have recognized that the cumulative effect of small errors may be so great as to work prejudice, and we have not hesitated to afford the party suffering that prejudice relief where it has been warranted." Pellicer ex rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 53 (2009) (citations omitted). Here, with the possible exception of the police officer's improper opinion testimony, none of the improprieties alone would warrant a new trial. Cumulatively, they

26

do. The trial court misapplied its discretion by denying defendant's motion for a new trial. Accordingly, we vacate the order of judgment and remand for a new trial.

Vacated and remanded. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27

A-3977-17T3